04ms 500

## AFFIDAVIT OF SPECIAL AGENT CALICE COUCHMAN

I, Calice Couchman, being duly sworn, do hereby depose and state under oath as follows:

### I. Introduction

1.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed for over 19 years. As a Special Agent of the DEA, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests and seizures for offenses enumerated in 18 U.S.C. § 2516.

2.      I am currently assigned to the Boston Field Division.  I have participated in the arrest of over 200 individuals for narcotics violations.  I have participated in undercover investigations involving the purchase of controlled substances, executed search warrants for controlled substances, executed seizure warrants for properties involved in controlled substance violations, and conducted surveillance in narcotics investigations which have allowed me to become familiar with the techniques utilized by drug dealers and traffickers to conceal their illicit narcotics, their criminal activities involving narcotics and materials related thereto in an effort to evade detection by law enforcement officials. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.

3.      Since becoming a Special Agent I have attended numerous courses and conferences relating to money laundering and asset removal matters.  I have been assigned to and participated in approximately forty (40) financial investigations which included civil and criminal aspects of Titles 18 and 21 as they relate to criminal and civil asset seizure and forfeiture and money laundering.   I have written, or assisted in the preparation of, over one hundred (100) seizure/forfeiture warrants and affidavits in support of forfeitures.

4.      Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to

1

transport and distribute narcotics and the proceeds of narcotics trafficking. I also am familiar with the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities. I am also familiar with the practice of many drug traffickers in not maintaining assets in their own names, but in the names of family members or close associates.

### This Case

5.   I have personally participated in the investigation of the subjects identified in this Affidavit since in or about May 2003. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other Agents of the DEA, other federal, state and local law enforcement agencies, oral and written reports of conversations and meetings with numerous confidential sources, a review of consensually recorded conversations, and a review of conversations intercepted pursuant to court-ordered wiretaps as well as my own personal participation in the investigation which includes surveillance and independent investigation.

6.   I submit this affidavit in support of an application for a criminal complaint against JULIO CARRION SANTIAGO, a/k/a "MACHO," PEDRO ALBERTO MIRANDA, a/k/a "TAVO," REYNALDO RIVERA, a/k/a "REY", JOSE RODRIGUEZ, ENRIQUE AGOSTO, JOSE TORRADO, CARLOS SANCHEZ, a/k/a "CARLITOS," LUIS R. SANCHEZ, a/k/a "PITO," EDWIN TORREZ, a/k/a "COQUI, a/k/a TIM," ZULEIMA REYES, a/k/a "LINDA," and SANTIAGO ARROYO (collectively, "Target Subjects") charging each of them with conspiracy to possess with intent to distribute and to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846.

7.   I also submit this affidavit in support of an application for the issuance of search warrants to be executed at the premises and vehicle listed in this paragraph (collectively, "the Target Locations")and as further described in **Attachment A** to the search warrants:

(a)   235 Eighteenth Street, Apartment 204, Dracut, Massachusetts as more

fully described below and in Attachment A-1 hereto;

(b)    264 Mechanic Street, second floor, right side (as viewed from Mechanic Street), Leominster, Massachusetts as more fully described below and in Attachment A-2 hereto;

(c)    270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts as as more fully described below and in Attachment A-3;

(d)    Mini-Self Storage, 3 Foundry Street, Lowell, Massachusetts as more fully described below and in Attachment A-5;

(e)    212 Wilder Street, 2nd floor, Lowell, Massachusetts as more fully described below and in Attachment A-6; and

(f)    a blue 1994 Plymouth Voyager minivan bearing Massachusetts registration 5133XA registered to Santiago ("Santiago minivan") and parked in the vicinity of Santiago's residence as more fully described below and in Attachment A-7

for evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §§846, 841(a)(1) and 841(b)(1)(B) as described more fully in **Attachments B** to the search warrants.

8.    This affidavit includes a summary of events that I am personally familiar with as well as information related to me by other law enforcement personnel who have been working on this investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish the requisite foundation for issuance of a criminal complaint against the Target Subjects and the issuance of search warrants for the Target Locations.

3

## Overview of Investigation

9.    As more fully set forth below, evidence gathered to date in this investigation reveals that the Target Subjects are involved in a conspiracy to possess with intent to distribute and to distribute heroin.  This investigation has involved information including but not limited to information received from confidential informants, purchases of heroin by an undercover agent in December 2003 and January 2004, telephone calls intercepted by and/or between the Defendants pursuant to court-authorized wiretaps on one cellular telephone used by RIVERA, three cellular telephones and a pager used by SANTIAGO and one cellular telephone used by TAVO (collectively, "the Target Telephones"), physical surveillance, information gathered by a Global Positioning Satellite ("GPS") device installed on the Santiago's minivan and review of subscriber information, pen register data and toll records relating to phones used by Defendants and/or their associates.

**A. Target Subjects**

**1.    JULIO SANTIAGO, a/k/a MACHO ("SANTIAGO")**

10.    JULIO SANTIAGO is 45 years old and resides at 264 Mechanic Street, 2nd floor, Leominster, Massachusetts.  He is the user of 347-200-5004, a T-Mobile cellular telephone with no subscriber information ("Target Telephone 1"),  347-248-7669, a T-mobile cellular telephone with no subscriber information ("Target Telephone 2"), 917-815-3487, a T-Mobile telephone with no subscriber information other than a March 10, 1981 date of birth ("Target Telephone 3") and 978-788-0589, a paging device bearing a cap code of A009880984, operating on frequency 929.6625MHz, owned by Metrocall Wireless, 890 East Heinburg Street, Pensacola, FL 32502, and subleased to New England Paging, a reseller, at P.O. Box 1644, Lowell, Massachusetts ("Target Pager"). As described further below, SANTIAGO has been intercepted via Target Telephones 1, 2 and 3, his cellular telephones, talking with various customers including AGOSTO, TORRADO, SANCHEZ, RODRIGUEZ, RIVERA, PITO, TORREZ and others in coded language about heroin transactions. He has also received numerous coded pages indicating quantities of drugs from some of these customers via the Target Pager. SANTIAGO has also been intercepted speaking

4

with TAVO, the person who is believed to be a drug associate of SANTIAGO's. During the course of this investigation, surveillance has observed SANTIAGO driving the SANTIAGO minivan to meet with customers for delivery of drugs ordered via previously intercepted calls and/or pages, to meet with TAVO, and to travel to Brooklyn, New York where, based upon intercepted calls and surveillance, there is probable cause to believe that SANTIAGO receives quantities of heroin for distribution. Although SANTIAGO has been the target of two prior DEA drug investigations, he has no prior drug arrests or convictions. The investigation to date has revealed that SANTIAGO distributes significant quantities of heroin to various customers in the areas of Leominster and Lowell, Massachusetts.

## 2. PEDRO ALBERTO MIRANDA, a/k/a TAVO ("TAVO")

11.    TAVO, is 35 years old and resides at 212 Wilder Street, Lowell, Massachusetts. TAVO is the user of 978-408-9075, a Sprint cellular telephone subscribed in the name of Paula Llano, 212 Wilder St., Apt. 2, Lowell, Massachusetts ("Target Telephone 4").    Based upon interceptions between TAVO and SANTIAGO as well as SANTIAGO and others on the Target Telephones, there is probable cause to believe that TAVO is a drug associate of SANTIAGO's. Surveillance have observed that on several occasions, SANTIAGO used TAVO's 212 Wilder Street, Lowell residence as a place to meet with some drug customers and deliver heroin that intercepted calls had indicated that had been ordered from SANTIAGO. On at least one of these occasions, surveillance observed TAVO serving as a "lookout" to detect any law enforcement surveillance. TAVO has a pending case in Middlesex Superior Court for trafficking in heroin and trafficking in cocaine, as a result of an arrest in Lowell. At the time of his arrest in that matter, TAVO identified himself as CARLOS COLON and had a Massachusetts driver's license in that name. He was identified as PEDRO ALBERTO MIRANDA through fingerprint comparison at the time of his arrest.

### 3. REYNALDO RIVERA, a/k/a REY ("RIVERA")

12.    REYNALDO RIVERA is 25 years old and resides at 235 18th Street, Apartment 204, in Dracut, Massachusetts. RIVERA does not have any criminal convictions. RIVERA is the user of 978-423-8173, an AT&T cellular telephone subscribed in his name ("RIVERA cell phone"). In or about June 2003, CI-3 provided information that an individual (later identified as RIVERA) was engaged in a series of apparent drug transactions occurring in the parking lot of the Old English Village apartment complex at 235 18th Street where RIVERA resides. According to CI-3, up until July of 2003, RIVERA had been conducting the above-described transactions most frequently inside Santiago's minivan, which was driven by a Hispanic male CI-3 later identified from a photograph as SANTIAGO. Surveillance at this location on July 29, 2003 confirmed that RIVERA met with the operator of the SANTIAGO minivan and engaged in a hand-to-hand exchange with the operator of Santiago's minivan. As discussed further below, an undercover agent arranged several heroin transactions with RIVERA in December 2003 and January 2004 and RIVERA arranged the delivery of the heroin through ARROYO and REYES. Surveillance during the last of the undercover agent's negotiations with RIVERA in February 2004 tentatively identified SANTIAGO as RIVERA's source of supply for heroin. Subsequently intercepted calls over the Target Telephones and the seizure of 20 grams of heroin that SANTIAGO left for RIVERA in his car on June 7, 2004 confirmed that SANTIAGO is RIVERA's source of supply.

### 4. JOSE RODRIGUEZ ("RODRIGUEZ")

13.    RODRIGUEZ is 42 years old and has a long history of drug trafficking. He is currently charged in Lowell District Court with possession of heroin with intent to distribute and conspiracy to violate the Controlled Substances Act for the 60-gram seizure from RODRIGUEZ's person and his residence on June 6, 2004 after intercepted calls with SANTIAGO and a delivery of same by SANTIAGO.

### 5. ENRIQUE AGOSTO ("AGOSTO")

14.    ENRIQUE AGOSTO is 39 years old and has a history of drug-related convictions.

6

On May 26, 1992, AGOSTO was convicted in Lowell District Court of distribution of cocaine, larceny, and breaking and entering in the nighttime with the intent to commit a felony. He was given a one-year house of correction sentence with ten days to serve; the balance was suspended for one year. On September 24, 1992, AGOSTO was convicted in Lowell District Court of distributing cocaine and heroin and was given a two-year sentence, with one year to serve and the balance suspended for two years. On October 10, 1994, AGOSTO was convicted in Middlesex Superior Court of possession of heroin with intent to distribute, second or subsequent offense, and was sentenced to state prison for five years. On May 5, 2004, Lowell, Massachusetts police officers arrested AGOSTO and seized approximately 15 grams of heroin from him. (I note that up to the time of this arrest, AGOSTO had not yet been identified as a target of this investigation and DEA had not yet been intercepting any of SANTIAGO's telephones). Based upon intercepted calls between AGOSTO and SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that AGOSTO is a heroin customer who has purchased distribution quantities of heroin from SANTIAGO.

### 6. JOSE TORRADO ("TORRADO")

15.    JOSE TORRADO is 23 years old and has no prior criminal convictions. He resides at 241 Moody Street, Lowell, Massachusetts. CI-2 identified TORRADO as one of RIVERA's drug associates. CI-1 informed law enforcement authorities in January 2003 that there had been a home invasion at TORRADO's Moody Street residence and that he had been robbed of 140 ten-gram fingers of heroin and $10,000 in cash and, as a result, TORRADO was looking to obtain a gun. On January 5, 2003, a Lowell Police Department detective observed a hand-to-hand transaction between TORRADO and two males at the Music Mall on Chelmsford Street in Lowell. Officers followed the two men as they departed the area in their vehicle and later stopped the vehicle. Although no heroin was discovered during the stop, both men admitted to having just bought heroin from an individual they knew as "Jose" (later identified as TORRADO) and that they had thrown the heroin out of the window before the car stop. Between November 2003 and March 2004, TORRADO drove a silver Toyota Matrix with Massachusetts license plate number 4985YL, which was registered to

7

RIVERA at his address. Intercepted calls over RIVERA's cell phone confirmed that TORRADO was a drug associate of RIVERA's. Based upon intercepted calls between TORRADO and SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that TORRADO is a heroin customer who has purchased distribution quantities of heroin from SANTIAGO. After surveillance of TORRADO meeting with SANTIAGO (which followed intercepted calls in which TORRADO, in coded language, ordered a quantity of heroin) on August 26, 2004, TORRADO engaged in counter-surveillance moves. Soon thereafter, law enforcement officers stopped TORRADO's vehicle. A search of TORRADO and his vehicle did not uncover any drugs. However, retracing the path of TORRADO's vehicle, law enforcement officers found a McDonald's cup containing approximately 10 grams of heroin. In subsequently intercepted calls, TORRADO informed SANTIAGO that he had lost the heroin that SANTIAGO had given him and they made arrangements for another transaction.

### 7. CARLOS SANCHEZ ("SANCHEZ")

16.     Carlos SANCHEZ is 22 years old and resides at 270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts. SANCHEZ has no criminal convictions. Based on intercepted conversations with SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that SANCHEZ is a heroin customer of SANTIAGO's who has purchased distribution quantities of heroin from SANTIAGO. Intercepted pages indicate that SANCHEZ has ordered quantities of heroin as large as 250 grams ("250" page) from SANTIAGO on numerous occasions. On October 7, 2004 after a "250" page and a series of intercepted calls via Target Telephone 3 in which SANTIAGO and SANCHEZ agreed to meet, surveillance agents observed SANCHEZ and SANTIAGO meet.

### 8. LUIS R. SANCHEZ a/k/a PITO ("PITO")

17.     PITO is 30 years old and resides at 427 Rosewood, Lane, Lowell, Massachusetts. Based on intercepted conversations with SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that PITO is a heroin customer of SANTIAGO's who has purchased distribution quantities of heroin from SANTIAGO.

### 9. EDWIN TORREZ a/k/a COQUI ("TORREZ")

18.     Edwin TORREZ is 38 years old and resides at 219 Black Brook Road, Lowell, Massachusetts. TORREZ has no known criminal record. Based on intercepted conversations with SANTIAGO and surveillance, there is probable cause to believe that TORREZ is a heroin customer of SANTIAGO's who has purchased distribution quantities of heroin from SANTIAGO. Surveillance agents have observed TORREZ meeting with SANTIAGO at TORREZ's Black Brook Road, Lowell residence, the Mini Self-Storage location that there is probable cause to believe is TORREZ's stash location and at TAVO's 212 Wilder Street, Lowell residence.

### 10. ZULEIMA REYES ("REYES")

19.     REYES is 23 years old and resides at 19 Conlon Terrace, Lowell, Massachusetts. She has no prior criminal convictions. As discussed further below, REYES, at the direction of RIVERA, delivered heroin to an undercover agent on December 18, 2003, January 7, 2004, January 14, 2004 and January 30, 2004. After the January 7th transaction, surveillance agents followed REYES and observed her engage in a hand-to-hand exchange with a customer. After this customer was subsequently stopped, law enforcement officers recovered ten bags of heroin from his vehicle that the customer confirmed that he had just purchased the heroin from REYES and had previously purchased heroin from REYES. Subsequently intercepted calls over the RIVERA cell phone confirmed that REYES was a drug associate of RIVERA's.

### 11. SANTIAGO ARROYO ("ARROYO")

20.     ARROYO is 20 years old and his last known address is 4 Murray Court, Apartment 6A, Nashua, New Hampshire. ARROYO drives a blue Chevrolet Cavalier bearing Massachusetts license plate registration 1641SJ, which is registered in ARROYO's name at 1016 Middlesex Street, Apartment AI, Lowell, Massachusetts, an address which a confidential informant ("CI-2") identified as a former RIVERA stash house. CI-2 also identified ARROYO as a "runner" (i.e., a deliverer of drugs to customers) for RIVERA but who has since been fired by RIVERA. As discussed further below, ARROYO, at the direction of RIVERA, delivered heroin to an undercover agent on one occasion on December 10, 2003.

9

## B. TARGET LOCATIONS

### 1. 235 Eighteenth Street, Apartment 204, Dracut, Massachusetts

("Rivera's 235 Eighteenth Street, Dracut residence")

**Description of premises (Attachment A-1)**

21.    235 Eighteenth Street in Dracut is the Old English Village apartment complex which is composed of three free-standing, brick and wood-frame, multi-unit apartment buildings. The middle of the three buildings bears the digits "235" in the center of a glass entrance door located on the left side and toward the front of the building as viewed from Eighteenth Street. Inside this main entrance door is a small vestibule with mailboxes. The mailbox for Apartment 204 bears the name "RIVERA." Apartment 204 itself is located on the second floor of this building. The front door to the apartment is brown and the digits "204" in gold are located in the center of the door.

22.    RIVERA resides at this location.[1] The cellular telephone that he uses to contact SANTIAGO, RIVERA's cell phone, is subscribed in his name at this address. The parking lot of the Old English Village apartment complex where Rivera's 235 Eighteenth Street, Dracut residence is located is where surveillance agents had observed RIVERA meet with SANTIAGO in SANTIAGO's minivan on February 12, 2004 after an undercover agent had negotiated with RIVERA to purchase eight ten-gram fingers of heroin in what appeared to be an apparent drug transaction. More recently, on October 13, 2004, surveillance observed SANTIAGO travel to and enter RIVERA's residence after intercepted calls and a page indicating that RIVERA wanted to purchase 14 fingers of heroin.

---

[1]Although RIVERA was barred from this residence on or abut February 17, 2004 as the result of a temporary restraining order, the order was in effect for approximately ten days. Based upon recent surveillance and intercepted calls, RIVERA still resides at this location.

**2. 264 Mechanic Street, second floor, right side (as viewed from Mechanic Street), Leominster, Massachusetts**
("SANTIAGO's 264 Mechanic Street, Leominster residence")

**Description of premises (Attachment A-2)**

23.     264 Mechanic Street is a blue-colored, wood-frame building which houses the Crystal dry cleaning establishment on the first floor in the front of the building, as well as apartments on the rear of the first floor and on all of the second floor. SANTIAGO's residence is located on the right side of the second floor as viewed from Mechanic Street. The entrance to the second-floor, right-side apartment is accessed at the rear of the building via a set of wooden stairs leading up to a small wooden porch. On the porch there are two doors. Access to SANTIAGO's apartment is gained through the door on the left as viewed from the rear of the building. A white storm door covers a solid brown panel door. (A photograph of 264 Mechanic Street is attached to Attachment A-2).

24.     Based upon intercepted calls to Target Telephones 1, 2 and 3, intercepted pages to Target Pager, all used by SANTIAGO, and physical surveillance and GPS tracking of SANTIAGO's minivan, SANTIAGO has traveled from SANTIAGO's 264 Mechanic Street, Leominster residence on numerous occasions to meet with drug customers and, on numerous occasions, has returned to this location after meeting with drug customers. Most recently, on October 9, 2004, surveillance observed SANTIAGO travel in Santiago minivan from SANTIAGO's 264 Mechanic Street, Leominster address to TAVO's 212 Wilder Street, Lowell residence for AGOSTO who had ordered heroin in previously intercepted calls that day.

**3. 270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts**

("SANCHEZ'S 270 Fairmont Street residence")

**Description of premises (Attachment A-3)**

25.     270 Fairmont Street, Fitchburg, MA is a four story light green vinyl sided, multi family dwelling with white trim. There is one apartment on each floor for a total of four apartments. There are four mailboxes. The names TORO, SANCHEZ, DIKOVIC are listed on the first floor mailbox. The door to the first floor is tan in color, with the numerals 270 affixed to the building to

the left of the first floor door. (A photograph of 270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts is attached to Attachment A-3).

26.    SANCHEZ resides at SANCHEZ'S 270 Fairmont Street residence. A check with the Fitchburg Gas and Electric Company, Unitil Energy System, revealed that SANCHEZ and his wife, Sujail TORO, are the gas and electric subscribers at this location. Most recently, on October 7, 2004 surveillance observed SANTIAGO travel to SANCHEZ's 270 Fairmount Street residence after intercepted calls between SANTIAGO and SANCHEZ in which SANCHEZ ordered a quantity of heroin.

### 5.  Mini Self-Storage, 3 Foundry Street, Lowell, Massachusetts
("Mini Self-Storage location")

### Description of premises (Attachment A-5)

27.    The first floor of the storage building located at Mini Self Storage, 3 Foundry Street, Lowell, Massachusetts is located in the left rear portion of the Mini Storage lot. It is located in a two story building with dark colored metal siding on the front of the building with white clapboard siding on the end of the building. A blue and white sign with the words, MINI SELF-STORAGE Tel. 978-453-8206, printed on it, is located on the top right corner of the side of the building. The entrance to the first floor is located on the right end of the building as viewed from foundry Street. The entrance consists of a set of solid white double doors. There are no numbers printed on the doors. (A photograph of Mini-Self Storage, 3 Foundry Street, Lowell, Massachusetts is attached as Attachment A-5).

28.    There is probable cause to believe that the Mini Self-Storage location is believed to be a location that TORREZ uses to stash heroin. On more than one occasion, surveillance has observed TORREZ unlocking the doors to the first floor of this location. (Previous information received from the clerk employed at this location is that the first floor is rented to a single individual (who she did not identify) and that this space is separate from the rental units on upper level that are saccessed from stairs on the outside of the building). On October 9, 2004, there were intercepted calls between SANTIAGO and TORREZ about meeting the next day. Later that day, however, the

GPS device on SANTIAGO's minivan revealed that it had traveled to the Mini Self-Storage location and had remained there approximately seven minutes.

**6. 212 Wilder Street, 2nd Floor, Lowell, Massachusetts**
("TAVO'S 212 Wilder Street residence")

**Description of premises (Attachment A-6)**

29.     212 Wilder Street, 2nd floor, Lowell, Massachusetts, is located in a two story, wood framed, two family residence, with white clapboard siding. It is located behind 210 Wilder Street down a short alley/driveway. The numerals 212 are affixed to the post supporting the porch to the front 2nd floor entrance. The front door to 212 Wilder Street, 2nd floor, is white in color with a white storm door and faces the alley/driveway. It is accessed from a porch which is reached by climbing a set of wooden stairs attached to the outside of the residence. (A photograph of 212 Wilder Street, 2nd Floor, Lowell, Massachusetts is attached to Attachment A-6).

30.     TAVO resides at TAVO's 212 Wilder Street residence. On several occasions, SANTIAGO has arranged to meet customers at this location for the delivery of heroin. On the most recent occasion on October 9, 2004 (as discussed further below in paragraphs 82), SANTIAGO arranged to meet with AGOSTO at TAVO's residence for what there is probable cause to believe was a heroin transaction.

**7.     Blue 1994 Plymouth Voyager minivan bearing Massachusetts registration 5133XA registered to Santiago**
("the SANTIAGO minivan")

**Description of vehicle (Attachment A-7)**

31.     The motor vehicle to be searched and seized is a blue 1994 Plymouth Voyager minivan bearing Massachusetts registration 5133XA and VIN 2P4GH45R5RR796331 registered to Julio Santiago at an address in Shirley, Massachusetts. (A photograph of the vehicle is attached to as Attachment A-7). During the course of this investigation, SANTIAGO has been observed driving two motor vehicles: Santiago's minivan and a red 2004 Chrysler Sebring rental car, bearing New Hampshire license plate registration 464-208, which, according to the records of Merchants Rent-A-Car at 1278 Hooksett Road, Hooksett, New Hampshire, was rented by Julio SANTIAGO

at a Shirley, Massachusetts address which also is the address appearing on Santiago's Massachusetts driver's license. However, SANTIAGO has only been observed driving the Santiago minivan when making heroin deliveries to his customers. Accordingly on or about June 28, 2004, DEA obtained a court order authorizing the installation of a GPS device within the SANTIAGO minivan and the device was installed on or about July 15, 2004. Since then the order has been renewed on August 13, 2004 and September 10, 2004. Based upon physical surveillance and GPS tracking of the vehicle in conjunction with intercepted calls on Target Telephones 1, 2 and 3 and intercepted pages to the Target Pager, SANTIAGO has driven the SANTIAGO minivan to deliver heroin to various customers.

## II. PROBABLE CAUSE FOR CRIMINAL COMPLAINT FOR TARGET SUBJECTS

### Controlled Purchases of Heroin
### from RIVERA and His Associates, ARROYO and REYES

32.     Between December 10, 2003 and January 30, 2004, DEA Task Force Agent Marcos Chavez ("TFA Chavez"), an undercover agent, made controlled purchases of over 100 grams of heroin from ARROYO and REYES, persons working for and at the direction of RIVERA. During this phase of the investigation, Julio SANTIAGO was also tentatively identified as RIVERA's heroin supplier.

33.     In late November, 2003, a confidential informant ("CI-2") who had been a heroin dealer reported to DEA that it had told RIVERA that it was no longer selling heroin and that RIVERA had approached CI-2 about purchasing CI-2's cellular telephone because RIVERA was interested in acquiring CI-2's former heroin customers. In early December, 2003, CI-2 sold its cellular telephone, (978) 854-4960, to RIVERA. Before doing so, and acting at the direction of DEA, CI-2 had added the undercover cellular telephone number of TFA Chavez into the directory of drug customers programmed into the cellular telephone's memory.

34.     On December 10, 2003, TFA Chavez called the cellular telephone which CI-2 had

14

transferred to RIVERA and spoke with a Hispanic male who identified himself as "Rey."[2]  TFA Chavez ordered one 10-gram "egg" of heroin[3] from RIVERA who agreed to meet TFA Chavez at the Showcase Cinema on Reese Avenue in Lowell at 1:00 p.m.  Immediately after that conversation, pen register data on the telephone showed an outgoing call from (978) 423-8173 ("RIVERA cell phone") to a cellular telephone listed to Santiago ARROYO and, thereafter, six additional calls between those two telephones between 12:47 p.m. and 1:25 p.m..

35.     At approximately 1:31 p.m., a blue Chevrolet Cavalier registered to ARROYO arrived at the Showcase Cinema location.  The vehicle was occupied by ARROYO and an unidentified female.  After identifying himself as "Santiago," ARROYO handed TFA Chavez a clear plastic bag, which contained a brown pellet of heroin, in exchange for $950.  When TFA Chavez complained that the price was too high, ARROYO stated that TFA Chavez would have to speak with "Rey" about that.  Three minutes after ARROYO met with TFA Chavez, pen register data showed an outgoing call from ARROYO'S cell phone to RIVERA'S cell phone.  Subsequent laboratory analysis revealed that the drugs purchased on this occasion from ARROYO contained 9.6 grams of heroin.

36.     On December 18, 2003, at approximately noon, TFA Chavez again called the cellular telephone which CI-2 had sold to RIVERA and heard a recorded message in a male Hispanic voice indicating that the number assigned to the phone had been changed to 978-726-3971 ("REYES cell phone").  Sprint records reveal that this number is assigned to a Sprint PCS cellular telephone listed to Zuleima REYES, at 19 Conlon Terrace, Lowell, Massachusetts.  When TFA Chavez called the REYES cell phone, REYES answered the call, identifying herself as "Linda."  She explained that "Rey" was not around and asked what TFA Chavez wanted.  TFA Chavez indicated that he wanted

---

[2]TFA Chavez later listened to conversations that were later intercepted between RIVERA and SANTIAGO on the Target Telephones and has recognized the voice of RIVERA as the voice of "Rey."

[3]Based upon my training and experience, I know that even a quantity of 10 grams of heroin is a distribution quantity, not a personal use quantity, of heroin.  Heroin is sold to users in baggies, usually in baggies of heroin with generally not more than .05 gram of heroin in each baggie.  Accordingly, a 10-gram quantity will yield, at a minimum, 200 baggies.

to purchase thirty grams of heroin. REYES replied that she only had one "finger" (meaning one ten-gram finger of heroin) and that she would have to call "the Boss." She asked TFA Chavez to call back in a little while. Pen register data show an outgoing call shortly thereafter from the REYES cell phone to the RIVERA cell phone.

37.    When TFA Chavez called again at approximately 12:20 p.m., REYES agreed to meet him at the Showcase Cinema parking lot in Lowell and she described the vehicle she would be driving. Pen register data showed an outgoing call from the RIVERA cell phone to the REYES cell phone at 12:26 p.m. that lasted 37 seconds. At approximately 12:51 p.m., TFA Chavez met with REYES in the cinema parking lot. REYES arrived in a car registered to her mother and there were two young children buckled into child safety seats in the back seat of the car. After a brief conversation, during which TFA Chavez recognized REYES' voice as the voice of the "Linda" with whom he had spoken on the phone, REYES handed TFA Chavez a clear plastic bag containing three heroin pellets in exchange for $2,800. REYES agreed that TFA Chavez could owe her $50, which she claimed was her payment for delivering the drugs. At 12:52 p.m., immediately after this transaction, pen register data showed an incoming call from the REYES cell phone to RIVERA'S cell phone that lasted less than two minutes. Subsequent laboratory analysis revealed that the drugs purchased by TFA Chavez on this occasion contained 29.4 grams of heroin.

38.    On January 7, 2004, TFA Chavez called REYES' cell phone and ordered twenty grams of heroin from REYES, who stated that she had to call her "boss" for the heroin and told TFA Chavez to call back in five minutes. Immediately after this call, pen register data showed an incoming call to RIVERA'S cell phone from a land line registered to REYES' mother at 19 Conlon Terrace in Lowell. While that call lasted only two seconds and may not have been completed, there was a series of five more calls between the same two phones, each lasting less than one minute, between 12:58 p.m. and 1:12 p.m. At approximately 1:31 p.m., TFA Chavez called back REYES, who agreed to conduct the transaction in the same cinema parking lot. Pen register data showed that the REYES cell phone was then used to place a twenty-second call to RIVERA'S cell phone at 1:34. Approximately three minutes later, REYES arrived at the appointed location, driving the same

16

vehicle with two small children again buckled into car seats in the rear of the car. After parking next to TFA Chavez, REYES handed him two heroin pellets wrapped in plastic in exchange for $1,950, including the $50 TFA Chavez owed REYES for the previous heroin delivery. In response to TFA Chavez's inquiries, REYES stated that "her boss" would not sell the heroin for less than $875 per "finger" (a ten-gram unit of heroin). She also stated that "the boss" could supply as much heroin as TFA Chavez wanted. Pen register data showed that the next contact between REYES' cell phone and RIVERA's cell phone occurred at approximately 1:53 p.m., shortly after REYES' meeting with the undercover agent. Subsequent laboratory analysis revealed that the drugs purchased by TFA Chavez on this occasion contained 20.0 grams of heroin.[4]

39.    On January 14, 2004, REYES called TFA Chavez from the REYES cell phone at approximately 12:14 p.m., responding to a message TFA Chavez had left for her on that phone earlier that day. TFA Chavez ordered 50 grams of heroin from REYES, who replied that she had at least thirty grams at her house, but that she might not have all fifty. Nevertheless, REYES stated that she would be ready to meet with TFA Chavez at 1:00 p.m. When TFA Chavez began to negotiate the price of the heroin, REYES stated that TFA Chavez would have to talk to "Rey" about that. REYES then arranged a three-way conference call between herself, TFA Chavez and "Rey." Pen register data confirm an outgoing call from the REYES cell phone to RIVERA'S cell phone at 1:16 p.m. that lasted ninety seconds. After joining the conversation, which was consensually recorded, RIVERA told TFA Chavez that he would lower the price to $900 per ten grams of heroin, but only if TFA Chavez intended to purchase large amounts. The parties agreed that TFA Chavez would meet REYES at the cinema parking lot. Pen register data showed a call from Rivera's cell

[4]After the January 7th transaction, surveillance agents followed REYES to the St. Hilaire Laudromat and Car Wash at 1682 Middlesex Street, Lowell, Massachusetts where agents observed her engage in a hand-to-hand exchange with a male.. Surveillance followed her customer and his vehicle stopped by police. A search of the center console of the vehicle revealed ten bags (containing a total of approximately one-half gram of heroin). The customer informed law enforcement officers that he had purchased 10 bags of heroin from "Linda" two to three times a week since early December 2003. He also provided the REYES cell phone number as the number he had used to contact Linda. Based upon this information and earlier surveillance, I believe Linda is REYES.

phone to the REYES cell phone at 12:18 p.m., shortly after the termination of the conference call, lasting one minute and forty-three seconds.

40.     At approximately 1:00 p.m., after arriving at the cinema parking lot, TFA Chavez called REYES, who explained that she only had four and a half "fingers," or approximately 45 grams of heroin. TFA Chavez insisted that he wanted all fifty grams. REYES responded that she would call "Rey" and that she would call TFA Chavez back in five minutes. Pen register data confirmed an outgoing call from REYES' cell phone to RIVERA'S cell phone at 1:04 p.m. that lasted two minutes and 35 seconds and another such call at 1:13 p.m. that lasted just eight seconds. At 1:25 p.m., REYES called TFA Chavez and said that she had only 46 grams and that the price would be $4,300. She further indicated that she did not want to meet at the cinema parking lot because she feared detection, referring specifically to security cameras and security guards in the area, as well as a police cruiser that patrolled the nearby Cross Point Towers. REYES also stated that recently "somebody" (which TFA Chavez took to mean another drug dealer) had been arrested in the area. Accordingly, it was agreed that TFA Chavez and REYES would meet in a quiet side street near the intersection of Chelmsford and Stevens Streets in Lowell.

41.     Surveillance officers then followed REYES from her residence at 19 Conlon Terrace in Lowell directly to the meeting with TFA Chavez. REYES arrived at approximately 1:37 p.m., again with her two young children in the back seat, and gave TFA Chavez a plastic bag containing six pieces of light brown heroin in exchange for $4,300. Subsequent laboratory analysis revealed that the drugs purchased on this occasion contained 45.7 grams of heroin.

42.     On January 29, 2004, the undercover agent called the Reyes cell phone again. The agent ordered three fingers of heroin from REYES on this occasion. They agreed to meet at Wendy's on Route 38 in Lowell, Massachusetts the following day. On January 30, 2004, they met at this location where REYES gave the undercover agent a white paper towel containing a clear plastic bag with three pellets of heroin. Subsequent laboratory analysis revealed that the drugs purchased on this occasion contained 30 grams of heroin.

43.    On February 12, 2004, TFA Chavez received a call from REYES at about 11:17 a.m. REYES told TFA Chavez she had "Rey" on the phone so they could do a three-way call. According to pen register data, RIVERA called REYES on February 12, 2004 at 11:07 a.m., 11:14 a.m. and again at 11:15 a.m., which would have been minutes before she called TFA Chavez. During the phone call between TFA Chavez, RIVERA and REYES, TFA Chavez negotiated with RIVERA for a lesser price per "finger" of heroin. RIVERA asked TFA Chavez when he wanted to purchase the heroin. TFA Chavez replied he wanted it that same day, February 12. RIVERA told TFA Chavez that REYES would get back to him in a few minutes. The call was terminated. Following the three-way call, pen data showed RIVERA calling at 11:24 a.m. Target Telephone 1, a cellular telephone used by SANTIAGO. After the call to SANTIAGO, RIVERA called REYES at 11:25 a.m. and again at 11:35 a.m.   TFA Chavez received a call from REYES at 11:38 a.m. letting him know that she would not be ready to sell him any heroin for about two hours as she was waiting for "the guy" to come down.

44.    During the time TFA Chavez was communicating with REYES on February 12, 2004, surveillance agents were stationed at and around RIVERA's 235 Eighteenth Street residence. At 12:33 p.m., DEA Special Agent Michael O'Shaughnessy observed the SANTIAGO minivan enter the parking lot at RIVERA'S 235 Eighteenth Street residence. (Pen register data showed an incoming call from Target Telephone 1 to RIVERA's cell phone at 12:27 p.m.) SANTIAGO was observed to be driving the SANTIAGO minivan. SANTIAGO parked in front of a 1999 black GMC Yukon, bearing Massachusetts registration plate 4740YR, registered to Reynaldo RIVERA at 235 Eighteenth Street. Shortly after SANTIAGO parked, RIVERA walked out to the parking lot and got into the SANTIAGO minivan. RIVERA was in the SANTIAGO minivan a few minutes, got out and SANTIAGO left the parking lot.

45.    After RIVERA got out of the SANTIAGO minivan at about 12:35 p.m., he got into his Yukon. Special Agent O'Shaughnessy saw RIVERA on his cell phone while getting out of the Yukon. Pen register data showed that the RIVERA cell phone called the REYES cell phone at 12:36 p.m.  Immediately following the call to REYES, RIVERA called SANTIAGO at 12:36 p.m.

19

RIVERA made eight phone calls to REYES between 12:37 and 2:31 p.m.   RIVERA was subsequently followed to Billerica where at 2:59 p.m. he drove into the Kmart Warehouse where he then worked. Surveillance was terminated and TFA Chavez did not follow up with REYES and never consummated the heroin transaction that he had negotiated with RIVERA that day. Subsequently, RIVERA and REYES refused to engage in further drug transactions with the undercover agent. I believe that they took this position in retaliation for the undercover agent's failure to consummate the February 12th deal and/or they suspected that he was connected to law enforcement.   As the subsequently intercepted calls and other evidence developed in this investigation confirm, however, RIVERA and REYES continue to engage in drug transactions.

### Interception of RIVERA's Cell Phone[5]

46.   On March 12, 2004, the Honorable Nancy Gertner authorized the interception of wire communications occurring over 978-423-8173, a Nextel cellular telephone subscribed to in the name of Target Subject REYNALDO RIVERA ("the RIVERA cell phone").   Interceptions over the RIVERA cell phone occurred between March 16, 2004 and April 1, 2004. During the interception of the RIVERA cell phone, conversations between RIVERA and SANTIAGO, TORRADO, REYES and other individuals not named in this complaint were intercepted.  The interceptions over the RIVERA cell phone confirmed that SANTIAGO was a source of supply for RIVERA. For example, in a March 18, 2004 series of calls, RIVERA (using RIVERA's cell phone) told SANTIAGO (using Target Telephone 1) that he had "five guys" going to the airport and wanted to know if SANTIAGO could take them.   Later that day, surveillance observed RIVERA meeting with SANTIAGO in SANTIAGO's minivan in the parking lot of RIVERA's 235 18th Street, Dracut residence.  The

---

[5]Intercepted conversations on the Target Telephones were in Spanish.  The summaries of intercepted conversations on the Target Telephones set forth in this affidavit are based upon summaries of conversations and draft translations that have been prepared by monitors who are fluent in Spanish and English. ·The calls summarized below are not all of the calls that have been intercepted, nor are the summaries verbatim accounts of each call.  The summaries are based upon preliminary summaries of the calls prepared by monitoring agents and information from agents involved in this investigation.  Where necessary, an interpretation of the substance of the calls based upon my training and experience and the information developed to date in this investigation is provided.

meeting lasted approximately three minutes and which RIVERA exited and entered the apartment building where his residence is located. Based upon the intercepted calls, surveillance and evidence gathered in this investigation, I believe that "five guys" was a reference to five units of heroin and that SANTIAGO met with RIVERA to deliver the quantity of heroin to him. The intercepted calls over the RIVERA cellphone also confirmed that TORRADO[6] and REYES were drug associates of RIVERA's. For example, in a March 24, 2004 call, at approximately 2:33 p.m., TORRADO called RIVERA and asked him, "Is there something there for me?" to which RIVERA responded, "You need to go pick it up...over there...not at the slope (meaning RIVERA's residence), but down there." TORRADO asked whether RIVERA meant "at the girl's?" to which RIVERA replied "Yes." Based upon my training and experience and the facts and circumstances of this investigation, I believe that RIVERA was advising TORRADO that he had drugs for TORRADO, but that TORRADO would have to go get the drugs from REYES.

47.    On April 1, 2004, DEA ceased interceptions over the RIVERA cell phone because it had become apparent to DEA that RIVERA had decreased his use of the RIVERA cell phone. I believe that the change in use of the RIVERA cell phone was due in part to CI-2's arrest by the Lowell Police Department on drug charges[7] which "spooked" RIVERA and because he became suspicious that law enforcement was investigating him.

**Interception of Target Telephones Used by SANTIAGO**

**Interception of Target Telephone 1 in June 2004 and Related Seizures Confirm that SANTIAGO Is Distributing Heroin**

48.    On June 2, 2004, DEA initiated a court-authorized wiretap on Target Telephone 1, the same telephone that SANTIAGO had used to communicate with RIVERA as discussed above. Interceptions over Target Telephone 1 began on June 2, 2004 and were terminated on July 1, 2004.

---

[6]In at least one intercepted call, on March 18, 2004, I believe that TORRADO was instructing RIVERA and an unidentified male about how to cook cocaine base.

[7]Information that had been previously provided by CI-2 in this investigation was corroborated by other information obtained in this investigation and, upon his arrest described above, CI-2 was deactivated as a confidential informant.

Almost as soon as the interception of Target Telephone 1 began, SANTIAGO and callers to Target Telephone 1 began to complain about problems with the telephone. As a result, SANTIAGO purchased a new telephone (Target Telephone 2) and his use of Target Telephone 1 waned. However, during the period of interception between June 2, 2004 and July 1, 2004, intercepted calls over Target Telephone 1 (and related surveillance) between SANTIAGO and RIVERA confirmed that SANTIAGO was RIVERA's source of supply for heroin. Intercepted calls over Target Telephone 1 (and/or related surveillance) also revealed that SANTIAGO supplied heroin to other customers.

<u>Santiago's Delivery of 60 Grams of Heroin to RODRIGUEZ</u>

49. At approximately 11:49 a.m. on June 6, 2004, SANTIAGO called RODRIGUEZ at (508) 982-0573, listed in Rodriguez's name at 261 Aiken Avenue in Lowell, Massachusetts. During the course of this intercepted conversation, SANTIAGO asked if RODRIGUEZ "still need[ed] 'the money'" and RODRIGUEZ answered affirmatively. SANTIAGO then indicated that he was going to take sixty (60) "dollars" out of the bank and would then call RODRIGUEZ, but asked if RODRIGUEZ would be there for sure so that SANTIAGO did not make the trip for nothing. RODRIGUEZ assured that he would be there. RODRIGUEZ indicated that he had to take his sister to the flea market but would return before 3:00 p.m. SANTIAGO then reiterated that he would withdraw "that" from that "account" and they agreed to speak again later. I understood that, in this intercepted conversation, SANTIAGO confirmed that RODRIGUEZ still wanted to purchase sixty (60) units of heroin and agreed to deliver them that afternoon.

50. Based on the foregoing and other intercepted telephone conversations, surveillance was established shortly after noon in the vicinity of the intersection of Seventh and Mechanic Streets in Leominster, Massachusetts. At approximately 2:30 p.m., a surveillance unit saw SANTIAGO drive the SANTIAGO minivan out of a small lot behind SANTIAGO'S 264 Mechanic Street residence.

51. At approximately 3:32 p.m., SANTIAGO called RODRIGUEZ, asked if the

22

latter had returned from the flea market and indicated that he had been waiting for RODRIGUEZ's call. RODRIGUEZ indicated that he had just returned and had called Target Telephone 1 but that the phone had rung busy. SANTIAGO indicated that was what a lot of people had told him, so he was going to get another cell phone the next day. SANTIAGO said he was leaving now to go "there" (meaning to meet RODRIGUEZ).

52.    At approximately 4:06 p.m., SANTIAGO called RODRIGUEZ and indicated he was "there" but asked how things were because he saw too many cars there. RODRIGUEZ assured SANTIAGO that everything was fine, but SANTIAGO asked if the cars belonged to people who knew them or to people who did not know them. RODRIGUEZ reiterated that everything was fine and SANTIAGO repeated that he had arrived.

53.    Based on the earlier calls between SANTIAGO and RODRIGUEZ, surveillance was established in the vicinity of RODRIGUEZ'S residence at 261 Aiken Avenue in Lowell at 4:00 p.m. that day.  At approximately 4:10 p.m., a surveillance agent saw SANTIAGO driving the SANTIAGO minivan slowly past that address. About one minute later, the SANTIAGO minivan was seen pulling into a space in the driveway which had just been vacated by a Hispanic male driving a blue Nissan pickup truck. After parking Santiago's minivan, SANTIAGO was seen seated in Santiago's minivan, bending and shifting from one side to another, as if retrieving something from the van's interior.  Approximately one minute later, the surveillance agent saw SANTIAGO exit Santiago's minivan and appear to fold under and then pull the bottom of his shirt. Another surveillance officer then saw SANTIAGO walk to the rear of the residence and walk up the stairs to the second-floor apartment.   At approximately 4:39 p.m., a third surveillance officer saw SANTIAGO exit the residence, return to the SANTIAGO minivan and drive it out of the area. Surveillance was maintained on Rodriguez's residence. Based on the facts that the Lowell Police Department had recently executed a search warrant at that residence and RODRIGUEZ was facing outstanding drug charges in Lowell Superior Court, DEA was advised that it was likely that RODRIGUEZ would try to move any heroin delivered by SANTIAGO from RODRIGUEZ's residence as soon as possible. At approximately 6:40 p.m., a surveillance officer saw RODRIGUEZ

exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running pants. RODRIGUEZ then began to walk inbound (south) on Aiken Avenue, still looking cautiously in all directions. Approximately a block and a half from his residence, RODRIGUEZ saw and waved down a black BMW driven by a Hispanic male later identified as Santiago Navarro. The BMW had been heading north on Aiken Avenue when it stopped at the intersection of Aiken and Hildreth Streets. RODRIGUEZ entered the front passenger seat of the BMW, which then headed inbound (south) on Aiken Avenue.

54.     The surveillance officer's observations, combined with his training and experience and his knowledge of RODRIGUEZ led the officer to believe that RODRIGUEZ was engaged in a drug transaction. A short while later, the BMW was stopped with the assistance of a marked police cruiser and both occupants were asked to and did exit the vehicle. As one detective pat-frisked RODRIGUEZ, a clear plastic baggie fell down the inside of RODRIGUEZ'S right leg and out the bottom of his pants. A second detective saw the bag fall and directed the first detective's attention to it. The bag was retrieved and it was found to contain a white rock and powder-like substance which the detective recognized as a "finger" of heroin. Another detective located in the rear passenger seat of the BMW a clear plastic bag containing what he immediately recognized as marijuana. Navarro was found to have $1,430 in cash on his person and RODRIGUEZ was found to have $270 in cash on his person. Both individuals were arrested and a loaded .22 caliber revolver was later retrieved from a small plastic case which was located under the driver's seat. Navarro was later charged with the illegal possession of the handgun and the heroin retrieved from RODRIGUEZ was later determined to weigh 10 grams.

55.     The Lowell Police Department then obtained a state warrant to search RODRIGUEZ'S apartment at 261 Aiken Avenue. During that search, approximately 50 grams of heroin were found in and seized from a drawer in the master bedroom. Based on the foregoing, I conclude that the "sixty dollars" referenced in Santiago's initial June 6 telephone conversation with RODRIGUEZ was a coded reference to 60 grams of heroin (the 10 grams of heroin seized from

24

Rodriguez's person and the 50 grams of heroin seized from his residence).

### Seizure of 20 Grams of Heroin Delivered by SANTIAGO to RIVERA

56.     The following day, Monday, June 7, 2004, at approximately 11:54 a.m., RIVERA called SANTIAGO, asked if the latter were coming that day and whether SANTIAGO had recorded the "CD." SANTIAGO replied by saying he would call back, which he did at approximately 12:09 p.m., at which time RIVERA asked SANTIAGO to bring RIVERA a Salsa "CD" and a Bachata "CD." SANTIAGO repeated and RIVERA then confirmed the order. SANTIAGO asked if RIVERA wanted two different "CDs" or separate ones. RIVERA replied by asking SANTIAGO to put them in two different cases. I understand that, in this intercepted conversation, RIVERA asked SANTIAGO to deliver to him two units of heroin (possibly of differing qualities) to be separately packaged.

57.     At approximately 1:13 p.m. on June 7, SANTIAGO called RIVERA and reported that he was "up on the hill." RIVERA told SANTIAGO that "the office" was open and "it" was there. SANTIAGO told RIVERA he would leave "the papers" there. SANTIAGO asked if RIVERA was talking about the same place in "the office," "the cabinet," where SANTIAGO had left "the papers." RIVERA told SANTIAGO to open the door and "they" will be there in a pouch. A few minutes later, at approximately 1:22 p.m., SANTIAGO called RIVERA and reported that he had left "the plant" there so that RIVERA could check on it and RIVERA agreed to do so.

58.     However, in light of the earlier intercepted calls between SANTIAGO and RIVERA, law enforcement surveillance vehicles had followed SANTIAGO and had seen him place an item inside of a vehicle which was registered to RIVERA and was parked in the parking lot of the apartment complex in which RIVERA resides. SANTIAGO had not used a key to enter the vehicle, so, after SANTIAGO had departed the area, a surveillance agent opened the same door to RIVERA'S vehicle and, in a pouch on the inside of the door, found and retrieved two packages, each of which were later found to contain ten (10) grams of a substance which field-tested positive for heroin.

59.     At approximately 6:07 p.m. on June 7, RIVERA called SANTIAGO and asked

where "the papers" were because he could not find them. Referring to the 20 grams of heroin which he had left in RIVERA's car, SANTIAGO replied that he had left "the papers" in "the drawer" where RIVERA had left "the papers" (possibly a reference to money). RIVERA insisted that "the papers" were not there and SANTIAGO swore on his mother that he had left them exactly in "the same drawer" where RIVERA had left "the papers" for SANTIAGO. RIVERA said he knew that SANTIAGO was not that kind of person, but that he could not find "the papers." RIVERA said that he had been trying to call SANTIAGO because he was worried but that Santiago's first target telephone had rung busy. They continued to discuss the disappearance of "the papers" and RIVERA indicated that he was counting on receiving them. SANTIAGO asked if anyone knew about their call (setting up the deal) and RIVERA replied in the negative. RIVERA asked if SANTIAGO had locked the door (to the car) and the latter indicated that he had not because he did not know if the car had an alarm system. SANTIAGO suggested that maybe somebody knew about it so RIVERA needed to check it out and asked RIVERA to call him back if RIVERA learned anything.

60.    On June 7 and 8, 2004, SANTIAGO and RIVERA had several intercepted conversations in which they discussed in veiled language the disappearance of the drugs from RIVERA's car. At approximately 7:01 p.m. on June 8, RIVERA called SANTIAGO, who asked if the former had been able to "solve 'that'" (referring to the disappearance of the heroin from Rivera's car). RIVERA replied in the negative and asked if SANTIAGO could go down "there." SANTIAGO indicated that he could not that day and that they could meet "down there" the next day. SANTIAGO told RIVERA to page him the next day and asked how many "guys" were going to "the company." RIVERA replied "two guys for now." I understand this to have been a coded reference to two units of heroin and, most probably, to two "fingers" or 20 grams of heroin to replace the heroin seized from RIVERA's car. RIVERA told SANTIAGO that, when RIVERA left his house the night before, all of the cars in the Old English Village parking lot had a piece of paper (on the windshield) indicating that several people had been seen wandering around and then RIVERA figured out what had happened yesterday (referring to the disappearance of the heroin from his car). SANTIAGO said that RIVERA had to check it out and that SANTIAGO would not go back to "that

26

hill" (meaning the Old English Village parking lot). RIVERA reiterated that the next day they would meet in another place. SANTIAGO agreed and reminded RIVERA to page him the next day.

61.    The next day, June 9, 2004, at approximately 9:37 a.m., RIVERA called SANTIAGO to make plans for the latter to "come down." SANTIAGO said he was going to be delayed because he had to heat up the water, to which RIVERA replied that there was no hurry but would like to see SANTIAGO as soon as possible. They both laughed and SANTIAGO said he would try to get moving as quickly as possible.

62.    At approximately 11:05 a.m., a surveillance officer saw SANTIAGO depart the vicinity of his residence driving the Santiago minivan. At approximately 11:32 a.m., SANTIAGO called RIVERA, who said he was "where the rubber is" (referring to the Tire Warehouse in Lowell, near where he was waiting for SANTIAGO). SANTIAGO said he would call RIVERA when he arrived and surveillance officers followed SANTIAGO in the SANTIAGO minivan to the vicinity of the Tire Warehouse, where he was seen meeting with RIVERA in the SANTIAGO minivan for approximately two minutes before RIVERA exited the SANTIAGO minivan and SANTIAGO drove away.

**Interception of Target Telephone 1 in June 2004, Target Telephone 2 in July 2004, Target Telephone 1 and 2 in August and September 2004, Target Pager and Target Telephone 3 in September and October 2004 Shows that SANTIAGO Continues to Conduct Drug Business with Numerous Customers and Associates**

63.    On or about June 8, 2004, SANTIAGO had re-activated Target Telephone 2 and gradually had stopped using Target Telephone 1 for drug-trafficking purposes in favor of Target Telephone 2. Accordingly, the previously court-authorized wiretap on Target Telephone 1 was terminated on or about July 1, 2004 and a court-authorized wiretap was initiated on Target Telephone 2 on June 29, 2004. Interception of Target Telephone 2 terminated on July 28, 2004. On August 16, 2004 DEA again initiated a court-authorized wiretap on Santiago's cellular telephones, Target Telephone 1 and Target Telephone 2. These interceptions continued until September 13, 2004 for Target Telephone 1 and September 7, 2004 on Target Telephone 2. The Court authorized

27

interception of electronic communications over the Target Pager, a paging device used by SANTIAGO, on September 9, 2004 and again on October 13, 2004. Interceptions of the Target Pager began on September 14, 2004 and are ongoing. The Court authorized a wiretap on Target Telephone 3 on September 29, 2004 and interceptions began on this telephone on September 30, 2004 and are ongoing. The following paragraphs discuss interceptions of SANTIAGO and other Defendants occurring on each of these telephones as they relate to each of the Defendants.

### SANTIAGO's Continued Heroin Transactions with RIVERA

64.     During a July 1, 2004 intercepted conversation over Target Telephone 2, RIVERA asked SANTIAGO for "four (4) in a bag." SANTIAGO confirmed the order and told RIVERA he would call RIVERA later. I understand "four (4) in a bag" to have been a coded reference to four "fingers" (10 grams each) of heroin loose, not compacted. At 1:08 p.m., SANTIAGO called RIVERA to ask where RIVERA was. RIVERA said he was heading to the "tire" place. SANTIAGO said he would meet him there. At 1:36 p.m., SANTIAGO called RIVERA to tell him he was at the tire place. RIVERA said he was going there. At 1:42 p.m., RIVERA called SANTIAGO to tell him some people were outside (possibly meaning surveillance personnel). They agreed to go to a street around the corner from the tire place. Surveillance officers followed SANTIAGO driving in the Santiago minivan to the vicinity of the Tire Warehouse at Hale Street in Chelmsford, Massachusetts, where SANTIAGO was observed meeting with RIVERA on other occasions, but on this occasion surveillance agents did not observe the meeting between SANTIAGO and RIVERA.

65.     On August 21, 2004 at approximately 1:46 pm an incoming call from RIVERA to Target Telephone 1 was intercepted. During the conversation RIVERA asked SANTIAGO if he had received the order. SANTIAGO replied in the affirmative and asked if the "guys" ( a previously coded reference to ten gram "fingers" of heroin, were going to play in the park today). They then made some coded references to the "food" being mixed and that they will work it out "over there." This appeared to be an indication that the heroin was not packaged in the exact amount that RIVERA has ordered and would need to be repackaged at RIVERA's residence. At approximately 2:08 p.m.

28

SANTIAGO called RIVERA and they agreed to meet on the "hill," a coded reference to RIVERA's 235 Eighteenth Street residence. At approximately 2:21 p.m., Task Force Agent Terry Hanson observed SANTIAGO arrive in the area of RIVERA'S 18th Street residence in the SANTIAGO minivan. At approximately 2:22pm SANTIAGO placed an outgoing call to RIVERA at (978)423-8173. During this call, SANTIAGO told RIVERA, "I'm here, open the door." At approximately the same time, TFA Hanson observed SANTIAGO at the door of RIVERA'S 235 Eighteenth Street. At approximately 2:31 pm, Det. Joseph Jakutis observed SANTIAGO return to his vehicle.

### Heroin deliveries from SANTIAGO to PITO

66.    On July 5, 2004 at approximately 9:56 p.m. a call was intercepted over Target Telephone 2 between SANTIAGO and PITO. During the ensuing conversation SANTIAGO asked PITO if he needed a "ride" tomorrow in the afternoon. PITO advised SANTIAGO that he would be available. SANTIAGO asked how many "guys" are going over there. PITO initially replied thirty or forty "guys" are going. PITO then indicated that thirty are going tomorrow. SANTIAGO told PITO that he would pass by the next day and would call PITO. SANTIAGO told PITO to have the group of guys and the "papers" to fill out. SANTIAGO has demonstrated in previously described conversations with RIVERA that he will use the code word "guys" when referring to amounts of heroin and "papers" when referring to money. In this conversation it is my understanding that PITO ordered 30 grams of heroin from SANTIAGO to be delivered the following day and that SANTIAGO wanted PITO to be sure and have the payment ready.

67.    The following day, July 6, 2004 at approximately 11:50 a.m. SANTIAGO called PITO and stated that he was going to leave to take the "guys" to the factory and asked PITO if he would be there. PITO replied in the affirmative and SANTIAGO told him to get ready. At approximately 12:21 p.m. that same date, SANTIAGO called PITO and asked him where PITO was. PITO replied that he was in "there." SANTIAGO told PITO to wait for him at the "company." These conversations indicate that SANTIAGO and PITO did meet to conduct the thirty gram heroin transaction.

68.    On August 26, 2004 at approximately 11:32 a.m., a conversation was intercepted

between PITO and SANTIAGO over Target Telephone 1. During the conversation SANTIAGO asked PITO if he needed him to "go fill out the papers." PITO replied in the affirmative and added that it would cost thirty "pesos." SANTIAGO told PITO to call him after work. Later that same date at approximately 2:03 p.m., another conversation between SANTIAGO and PITO was intercepted over Target Telephone 1. During that conversation PITO advised SANTIAGO that he had found out about the papers and the price went up. It was 50 "pesos" now. Based on previously intercepted coded conversations, where amounts of heroin are referred to in monetary units, it is my understanding that PITO arranged to purchase thirty grams of heroin from SANTIAGO, then revised the amount up to fifty grams of heroin.

69.     Later that same day August 26, 2004 between approximately 5:50 p.m. and 6:06 p.m. there were three intercepted conversations between SANTIAGO and PITO ultimately resulting in an agreement between them to meet at PITO's residence. At approximately 6:10 p.m., Special Agent Coletti drove to the area of 219 Black Brook Drive (TORREZ's residence) and 427 Rosewood Lane (PITO's residence) in Lowell, Massachusetts. Upon arrival, at approximately 6:11 p.m., Special Agent Coletti observed SANTIAGO in the parking lot of the "Redwood Terrace" housing complex, physically on Rosewood Lane. SANTIAGO was stationary in the Santiago minivan, backed into a parking spot and appeared to be monitoring vehicle traffic on Westford Road. A short time later, S/A Coletti observed SANTIAGO exit his vehicle, wearing a white t-shirt, denim shorts and white sneakers. SANTIAGO opened the hood of the van and appeared to remove an item from underneath the hood/engine compartment. Once finished, SANTIAGO closed the hood and returned to the driver's seat of the SANTIAGO minivan.

70.     At approximately 6:15 p.m., Special Agent Coletti observed SANTIAGO exit the van a second time and walk toward a Hispanic male, with short/shaved hair, wearing a blue t-shirt and yellow shorts later identified as PITO. PITO was observed by Special Coletti exiting 427 Rosewood Lane. Special Agent Coletti observed SANTIAGO and PITO engage in a brief conversation and then PITO walked over and entered the SANTIAGO minivan.

71.     A short time later, Special Agent Coletti and Special Agent Michael O'Shaughnessy