UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 04-10336-NMG |
| | ) |
| ENRIQUE AGOSTO | ) |
| | ) |
| Defendant | ) |

## GOVERNMENT'S PROFFER OF CO-CONSPIRATOR STATEMENTS

### Introduction

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, respectfully submits this motion seeking to admit against the Defendant numerous co-conspirator statements recorded by surveillance agents from intercepted telephone communications. The Government expects that the evidence admitted at trial will show that the Defendant and co-defendants, from about December 10, 2003 to about October 15, 2004, knowingly and intentionally conspired to distribute or possess with intent to distribute 1 kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Over the course of the investigation, numerous telephone calls between various co-defendants were intercepted by law enforcement agents.

### Examples of Co-Conspirator Statements

The following are typical examples of the statements to be introduced:

Example 1:

There were intercepted calls in which Enrique AGOSTO and Julio SANTIAGO used coded language to discuss a heroin transaction and make arrangements to consummate same. One such call occurred on June 2, 2004, at approximately 8:47 p.m., during which AGOSTO tells SANTIAGO that he is interested in the deal but that he has to get rid of the ones he has in the store because there is no space for the new ones. SANTIAGO tells AGOSTO to look for another person and they then agree to meet the following day.

Example 2:

During a call that took place on June 8, 2007, AGOSTO tells SANTIAGO that he has not been able to get "tickets" for the dance, so AGOSTO wants SANTIAGO to get them for him. SANTIAGO asks if the tickets are for the Oscar de Leon dance and wants to know who is going to go. AGOSTO responds that he needs tickets for "ten adults and one child." SANTIAGO then asks if the ten are for "above" and one is for the "front" where the "musicians" are. AGOSTO answers in the affirmative. SANTIAGO tells AGOSTO that he will have to wait because SANTIAGO is about two hours away and AGOSTO asks SANTIAGO to "reserve" the tickets for him.

Example 3:

During a July 1, 2004 call at approximately 4:34 p.m., AGOSTO and SANTIAGO agreed to meet early the next day. SANTIAGO asked AGOSTO how much he needed. AGOSTO replied "sixty." SANTIAGO asked if it was only 60 pesos (meaning 60 grams of heroin) AGOSTO replied in the affirmative. SANTIAGO asked AGOSTO to get it from the same "money order." SANTIAGO said that it was all going to be in the same money order and that they would talk later on. SANTIAGO advised AGOSTO that he would call him later that night. In a later call that day at approximately 4:49 p.m., AGOSTO indicated that he was getting the heroin for a customer. During this conversation AGOSTO told SANTIAGO that "this one" called him and asked if SANTIAGO could get "him" an additional "money order" for $16.00 (meaning that he wanted 16 grams in addition to the 60 grams that he had ordered earlier). SANTIAGO asks if the $16.00 was separate from the $60.00 "money

2

order." AGOSTO replied in the affirmative. They agreed that SANTIAGO would call AGOSTO at 6:00 a.m. the following day July 2, 2004. On July 2, 2004 at approximately 7:46 a.m., an incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During that call SANTIAGO asked AGOSTO if he was ready to go to the "beach." SANTIAGO told AGOSTO to get ready because SANTIAGO is waiting for AGOSTO to go to the "beach." SANTIAGO instructed AGOSTO to take the right amount of money for the "parking." SANTIAGO insisted that AGOSTO calculate how much and bring the right amount of money.

A short time later, surveillance observed SANTIAGO leaving his residence in the SANTIAGO minivan. Surveillance officers then followed SANTIAGO directly to Lowell where surveillance lost him in the area of the River Place apartment complex at approximately 8:20 a.m. At approximately 8:15 a.m. an outgoing call from SANTIAGO to AGOSTO was intercepted over Target Telephone 2. During that call SANTIAGO told AGOSTO he was about to leave town. AGOSTO asked SANTIAGO to meet him at Josefina's house, AGOSTO's little sister. During further conversation SANTIAGO told AGOSTO to start walking over there. Surveillance never picked up AGOSTO or saw him meet with SANTIAGO, but was able to locate SANTIAGO at approximately 9:05 a.m. close to the area in which the two had agreed to meet.

Example 4:

Agents also believed from intercepted telephone conversations that SANTIAGO employed AGOSTO to test the quality of heroin. For example, on June 30, 2004, a call was intercepted during which SANTIAGO asked AGOSTO to check the "carburetors and injectors." Thereafter, at approximately 1:10 p.m., another call was intercepted during which SANTIAGO inquired of AGOSTO, "are you checking the injectors now?" and AGOSTO responded, "U-huh." Twenty-three minutes later, AGOSTO spoke to SANTIAGO and informed him that "the cakes were too delicious." SANTIAGO responded that that was "good news."

Example 5:

AGOSTO also communicated amounts of heroin that he needed from SANTIAGO over SANTIAGO's pager. For example, on October 9, 2004, there were a series of calls and pages to the Target Telephone 3 and Target Pager between AGOSTO and SANTIAGO. In one of these calls, SANTIAGO told AGOSTO to put the phone number and the "time" (meaning the quantity of heroin he wanted to buy) on the "card"

3

(meaning the Target Pager) and that they would meet later.  About thirty-five minutes later, the Target Pager received a "9369-100" which is the last four digits of a telephone number used by AGOSTO and "100" refers to a 100-gram order of heroin.[1]  At 7:19 p.m, the Target Pager received a page of "978-397-0840-100" which is a phone number used by RODRIGUEZ  and again "100" refers to a 100-gram order of heroin.  SANTIAGO tried to reach AGOSTO at various numbers including the number above, but to no avail.  Then, at approximately 7:23 p.m., SANTIAGO called RODRIGUEZ at 978-397-0840. In the course of conversation, RODRIGUEZ agreed "when the guy has the luggage (meaning money for heroin) ready to call him (meaning SANTIAGO)."  SANTIAGO further instructed Rodriguez to have him (AGOSTO) call him (meaning SANTIAGO) as soon as possible.  At approximately 8:02 p.m., SANTIAGO called the same number on which he previously talked to RODRIGUEZ and talked to AGOSTO.  SANTIAGO asked AGOSTO what his problem was.  AGOSTO said that he had the "suitcases" (meaning the money).  At approximately 8:45 p.m., surveillance agents observed the SANTIAGO minivan around the corner from TAVO's residence.  In a 9:04 p.m. call from SANTIAGO to the same phone number, SANTIAGO again spoke with AGOSTO.  SANTIAGO indicated that he had to go and AGOSTO said that he was on his way there (meaning to meet SANTIAGO at TAVO's residence).  SANTIAGO asked him if "the guy" (meaning RODRIGUEZ) was giving him a ride to which AGOSTO responded no.  SANTIAGO said that "it is not at your sister's house you hear."  AGOSTO acknowledged that he knew this (indicating that he knew that they were going to meet at TAVO's residence).  Surveillance observed AGOSTO arrive and walk down the street toward 212 Wilder Street.  At approximately 9:27 p.m., SANTIAGO called the same phone number again.  AGOSTO said that he was there and SANTIAGO told AGOSTO that he should come on up (meaning he should come on up to TAVO's apartment that was located on the second floor).

The telephone number 978-454-9369 corresponds to the number of the telephone used by AGOSTO to communicate with SANTIAGO, and the following numeric entries correspond to amounts of heroin ordered.  So, for example, at 3:12 p.m. on September 26, 2004, AGOSTO, using telephone numbered 454-9369, ordered two packages of heroin, each weighing 100 grams apiece, for a total of 200

---

[1]This coded page is typical of the type of pages that SANTIAGO received from his customers.  Some customers would type in their full phone number followed by the quantity of heroin that they wanted to buy ("50", "100", "250").  Others just typed in the quantity with no identifying phone number or partial phone number.

grams of heroin.

_____

These are but a few of the intercepted and recorded
telephone conversations that the Government seeks to admit.
Under Fed. R. Evid. 801(d)(2)(E), co-conspirator statements are
not hearsay if "made by a coconspirator of a party during the
course and in furtherance of the conspiracy."  Moreover,
admission of these statements does not violate Defendants' rights
under the Confrontation Clause because they are nontestimonial in
nature and fall into a firmly rooted hearsay exception.


**Argument**

The government submits that the statements are properly
admitted into evidence pursuant to Federal Rule of Evidence
801(d)(2)(E), as statements of co-conspirators of the defendant
during the course of, and in furtherance of, the conspiracy.

In order to qualify as admissions of a co-conspirator,
statements must be made by a co-conspirator during the course of
a conspiracy and in furtherance of the conspiracy.  The
government must show that a conspiracy that embraced the
declarant and the defendant existed, and that the declarant
uttered the statement during and in furtherance of the
conspiracy.  <u>United States v. Piper</u>, 298 F.3d 47, 51-52 (1st Cir.

2002).   See also United States v. Petrozziello, 48 F.2d 20, 23

(1st Cir. 1977).   In United States v. Ciampaglia, 628 F.2d 632

(1st Cir. 1980), the Court outlined the procedures to be employed

when co-conspirator statements are offered into evidence:

> [I]f the government attempts to introduce a statement
> under Fed. R. Evid. 801(d)(2)(E), the Court, upon
> proper objection, may, if it so chooses, admit the
> declaration subject to it being "connected up." At that
> time the court should inform the parties out of the
> hearing of the jury that:  (a) the prosecution will be
> required to prove by a preponderance of the evidence
> that a conspiracy existed, that the declarant and
> defendant were members of it at the time that the
> declaration was made, and that the declaration was in
> furtherance of the conspiracy, (b) that at the close of
> all the evidence the court will make a final
> Petrozziello determination for the record, out of the
> hearing of the jury; and, (c) that if the determination
> is against admitting the declaration, the court will
> give a cautionary instruction to the jury, or, upon an
> appropriate motion, declare a mistrial if the
> instruction will not suffice to cure any prejudice.

Ciampaglia, 628 F.2d at 638 (footnotes omitted).   In determining

the admissibility of co-conspirator statements, the Court may

consider any relevant evidence, including the statement sought to

be admitted. See, e.g., Bourjaily v. United States, 483 U.S. 171,

181 (1987); United States v. Rivera-Santiago, 872 F.2d 1073,

1092-93 (1st Cir. 1989).   Standing alone, however, a co-

conspirator statement cannot establish by a preponderance of the

evidence the existence of a conspiracy embracing both the

declarant and the defendant. See United States v. Sepulveda, 15

F.3d 1161, 1182 (1st Cir. 1993).

6

### A.    A Conspiracy Existed.

The charges against the defendants arose out of an investigation conducted by the DEA.  Information from a confidential informant ("CI-3") and subsequent law enforcement surveillance revealed that an individual (later identified as co-defendant Reynaldo Rivera) was engaged in a series of apparent drug transactions occurring in the parking lot of Rivera's residence at the Old English Village apartment complex at 235 18th Street in Dracut and that typically Rivera engaged in these hand-to-hand exchanges with the operator of a minivan driven by a male later identified as Julio Santiago.  Prior to the date of the conspiracy charged in the Superseding Indictment, physical surveillance in 2003 confirmed Rivera meeting with Santiago in the parking lot outside 235 18th Street and engaging in activity consistent with narcotics distribution, and trash-pulls associated with Rivera during this same time period uncovered evidence of drug distribution.

Between December 2003 and January 2004, an undercover agent arranged several heroin transactions with Rivera that involved his "runners," co-defendants Zuleima Reyes and Santiago Arroyo. In each of these transactions, the undercover agent would negotiate the price and quantity of heroin and the location (usually Showcase Cinema parking lot in Lowell) to receive the heroin with Rivera (or with co-defendant Zuleima Reyes who would

then contact Rivera) by telephone. These conversations were consentually recorded by TFA Marcos Chavez.  Pen register data showed that Rivera's cell phone was then in contact with a telephone subscribed to by Rivera's runners, co-defendants Santiago Arroyo or Zuleima Reyes.  Pen register data also showed that the Rivera cell phone called Reyes' cell phone after his meeting with Santiago. Subsequently intercepted calls pursuant to TIII orders, surveillance and seizures confirmed that Santiago was Rivera's source of supply.

As detailed in the government's previous oppositions to motions to suppress, beginning in March 2004 the DEA wiretapped five telephones and one paging device belonging to Santiago and/or his associates.  Intercepted calls over the Target Telephones confirmed that Santiago was supplying large quantities of heroin not only to his main customer, Rivera, but was making regular deliveries to and collecting drug monies from or otherwise dealing with numerous other drug customers, including the named co-defendants and Enrique Agosto; that he had numerous drug associates including the defendants; and that he had a source of supply in New York (later identified as co-defendant Juan Nunez).

The consentual recordings and the T-III intercepts regarding heroin distribution, corroborated by physical surveillance, will establish well beyond a preponderance of the evidence that a

conspiracy existed between and among the declarants with each of the co-defendants, including Enrique Agosto.

Moreover, there also exists strong circumstantial evidence of the conspiracy as well. For example, On May 5, 1004, Lowell Police stopped Enrique Agosto and found on his person approximately 600 plastic baggies labeled "moonwalk" and depicting an astronaut. The bags contained approximately 15 grams of heroin. Those baggies match precisely the type of baggies seized from Jose Rodriguez's residence on April 18, 2003, and seized from Rodriguez during his arrest on October 15, 2004. Similarly, bags depicting a apple stamp were seized from several locations during and at the conclusion of the investigation -- including Edwin Torrez, Zuleima Reyes, and Jose Rodriguez.

Seizures at the conclusion of the investigation also established strong circumstantial evidence of the charged conspiracy. For example, on October 14, 2004, police stopped Santiago in his minivan after he had met with Juan Nunez in New York to receive a large quantity of heroin. Inside a hidden compartment in Santiago's van agents discovered approximately 500 grams of heroin. A search of Santiago's apartment in Leominster on October 15, 2004, uncovered approximately 115 grams of heroin, digital scales, a money counter, a finger press, a 9 mm Luger firearm and three silencers. Inside Rivera's apartment at 235 18th Street, Dracut, MA, agents discovered approximately 200 grams of

heroin, a finger press, latex gloves and $3,200 in cash.  When agents went to 261 Aiken Avenue, 2nd Floor, Lowell, to execute an arrest warrant, Rodriguez refused to allow them entry.  After breaching the door, agents found Rodriguez in the bathroom inside the apartment.  Inside his left hand and on the floor next to his feet agents found heroin, which was contained in two plastic bags with an apple imprint.  Those two apple-imprint bags contained additional baggies depicting an astronaut with a "moonwalk" logo. A search of Miranda's residence at 212 Wilder Street, Lowell, uncovered, among other things, inositol (an agent used to dilute heroin), a surgical mask, rubber gloves, personal papers,  and a false social security card in the name of "Carlos Colon."  A search of a locker belonging to Edwin Torrez at the Mini Self-Storage facility in Lowell on October 15th uncovered "It's Hot" and apple baggies  (that were the same as the baggies containing heroin found on RODRIGUEZ and in REYES' apartment on that very day) and other items used in the packaging of heroin were found there.  When REYES was arrested at her residence on October 15th, she voluntarily directed the agents to 4 fingers of heroin (40 grams) in her closet.  A search of Carlos SANCHEZ's residence in Fitchburg on October 15th revealed Procaine, an item that can be used in cutting and processing heroin for resale.

NUNEZ, who was SANTIAGO's source of supply (or, at a minimum, SANTIAGO's connection to a source of supply), was identified as

10

having provided the ½ kilogram of heroin that was seized from SANTIAGO's minivan on October 14, 2004.

While the indictment alleges the conspiracy operated from about December 10, 2003 to about October 15, 2004, Agosto may attempt to argue that he was not a member of the conspiracy until on or about May 5, 2004, and that therefore, any co-conspirator statements made prior to that date are inadmissable against him; however, this argument conflicts with the controlling case law enunciated in United States v. Baines, 812 F.2d 41 (1st Cir. 1987)(allowing the admission of co-conspirator statements against late-joining co-conspirators).  In Baines the Court held that a late-joining conspirator takes the conspiracy as he finds it: " a conspiracy is like a train" and "when a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight, or conduct, regardless of whether he is aware of just what is composed." Id. at 42; *Accord* United States v. Saccoccia, 58 F.3d 754, 778 (1st Cir. 1995); United States v. Goldberg, 105 F.3d 770,775 (1st Cir. 1997).

**B.    The Statements were in Furtherance of the Conspiracy.**

All of the statements that the government will seek to introduce into evidence were made in furtherance of the conspiracy under the law established by the United States Court

of Appeals for the First Circuit.  A statement is admissible

under 801(d)(2)(E) so long as it "tends to advance the objects of

the conspiracy as opposed to thwarting its purpose."  United

States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995).  This

standard is administered flexibly.  United States v. Garcia-

Torres, 280 F.3d 1, 5 (1st Cir. 2002).  The statement "need not

be necessary or even important to the conspiracy, or even made to

a co-conspirator, as long as it can be said to advance the goals

of the conspiracy in some way."  United States v. Martinez-

Medina, 279 F.3d 105, 117 (1st Cir. 2002).  A preponderance

standard governs this finding.  E.g., United States v. Perez-

Ruiz, 353 F.3d 1, 11 (1st Cir. 2003).

Here, the statements plainly meet this standard.[2] All of the

intercepted telephone communications were made between March 2004

and October 2004, within the period of the conspiracy alleged.

The statements involve Defendants' efforts and attempts to

negotiate, transfer, and consummate heroin transactions.  The

statements also demonstrate an intent to thwart law enforcement's

efforts to investigate them through coded language and counter

---

[2]The government is in the process of preparing finalized
transcripts of the entirety of the recorded conversations which
it intends to introduce in evidence at trial. See United States
v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986) (finding that
English-language translations of tape-recorded conversations that
originally took place in Spanish are admissible as substantive
evidence).

surveillance.  Consequently, the statements that the government
seeks to admit were made during the course of, and in furtherance
of, the charged conspiracy and are therefore admissible.

> **C.   Admission of the co-conspirator statements does not
>        violate Defendants' rights under the Confrontation
>        Clause.**

Co-conspirator statements made in the course of and the
furtherance of a conspiracy are nontestimonial in nature. United
States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005).  See also
United States v. Hansen, 434 F.3d 92, 99 (1st Cir. 2006)  The
admission of nontestimonial co-conspirator statements does not
violate Defendants' rights under the Confrontation Clause.[3]
United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005).  See
also Ohio v. Roberts, 448 U.S. 56, 66 (1980) (finding that co-
conspirator statements fall within a firmly rooted hearsay
exception, so their admission does not violate the Sixth
Amendment); see also United States v. Inadi, 475 U.S. 387, 399-
400 (1986) (Sixth Amendment does not require proof of
unavailability of declarant for admission of co-conspirator
statements).

The statements made by Defendants were made in furtherance
of the conspiracy, as shown above, and not made with the

_____

[3]Sixth Amendment analysis regarding unavailability and prior
opportunity for cross-examination is not required when the out-
of-court statement in question is nontestimonial in nature.
Crawford v. Washington, 541 U.S. 36, 68 (2004).

13

expectation of their use in a court of law.  Therefore the statements are nontestimonial in nature, their admission does not violate the Defendants' rights under the Confrontation Clause, and no additional Confrontation Clause analysis is required.

### Conclusion

Based on the foregoing, the government's motion for leave to introduce into evidence at trial co-conspirator statements from recordings of the intercepted telephone communications should be allowed.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:  */s/William F. Bloomer*
WILLIAM F. BLOOMER
Assistant U.S. Attorney
BBO#553104                    willi
am.bloomer@usdoj.gov
(617) 748-3644

### CERTIFICATE OF SERVICE

I, William F. Bloomer, hereby certify that this document filed through the ECF system on November 13, 2007, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants this date via US Postal Service, postage prepaid.

/s/William F. Bloomer
WILLIAM F. BLOOMER

Date: 13 November 2007

14