```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA    )
                            )
        v.                  )
                            ) Cr. No. 04-10336-NMG
ENRIQUE AGOSTO              )
                            )
    Defendant               )
```

## GOVERNMENT'S MOTION *IN LIMINE* REGARDING EXPERIENCED NARCOTICS INVESTIGATORS' TESTIMONY

### Introduction

The United States, by its attorneys, Michael J. Sullivan, United States Attorney, and William F. Bloomer, Assistant U.S. Attorney, hereby alerts this Court of its intention to elicit testimony from Inspector Marcos Chavez, Trooper Jaime Cepero, and / or Captain Terry Hanson regarding narcotics-related matters generally outside the ken of ordinary layperson jurors. The government will seek to admit testimony regarding the interpretation of coded drug-related conversations, the use of codes over paging devices, and general narcotics related matters, more fully described below, because such testimony (1) is admissible coming from experienced investigators under Federal Rule of Evidence 701 or otherwise,[1] and (2) even assuming that

---

[1] The undersigned prosecutor specifically noted in the Government's Summary of Testimony to be Offered Under Fed. R. Evid. 702 that it was questionable whether the anticipated testimony of TFA Chavez and/or TFA Jamie Cepero and Captain (formerly Lieutenant) Terry Hanson qualified as "expert" testimony for the purposes of Rule 702, but provided the

the proffered testimony constitutes "expert" testimony under Fed. R. Evid. 702, testimony at trial from an experienced narcotics agent about coded language in the drug trade as well as general narcotics related matters is admissible.

<u>The Substance of The Witness' Testimony and the Bases for its Admission</u>

*TFA Marcos Chavez*

Five telephones and a pager associated with Julio Santiago, Reynaldo Rivera, and their co-conspirators (including Enrique Agosto) were tapped pursuant to court orders. Hundreds of drug-related conversations between Santiago, Rivera and their associates were intercepted. During these conversations, coded and cryptic language was used to refer to heroin, drug money, and activities and items associated with heroin distribution. By way of examples, heroin was referred to in substance as, among other things, the following: "guys," "CDs" ("salsa" and "bacheta"), "carburetors," "injectors," "cake," "movies," "tickets," "papers," "registration papers," "dollars," "workers," "that," "one(s)," "innings," "pesos," "number," "money orders," "two of the good ones for Taylor," "100 flans," "plant," "time," and other cryptic terms. Drug money was referred to in substance as, among other things, the following: "papers," "tickets," "that," "car papers," "luggage," "suitcases," and other vague terms.

---

discovery "out of an abundance of caution."

Activities associated with heroin distribution (such as processing and testing the drug), and heroin distribution itself, were referred to in substance as, among other thing, the following: "filling out some papers," "working on the car," "playing," "checking the carburetor and injectors," "playing [or watching] the game / ball or baseball," "getting ready to go to the beach," "factory job," going to or taking trips to various locations, and "putting the number in the little box" [referring to entering a heroin order into Santiago's pager].  Transcripts containing references to the above-described terms have been provided to the defense.  In addition, the affidavits submitted in support of the wiretap warrants detail the investigators' interpretation of such codes in the context of this investigation.

   Drug dealers frequently use jargon that is specific to the industry or deliberately cryptic to avoid detection by law enforcement.  Consequently, "[l]ay jurors cannot be expected to be familiar with the lexicon of the [drug] community." Hoffman, 832 F.2d at 1310.  See also United States v. Echeverri, 982 F.2d 675, 680 (1st Cir. 1993) ("Laymen, on average, are not familiar with the praxis of the cocaine community."); United States v. Ladd, 885 F.2d 954, 960 (1st Cir. 1989) ("[J]urors are not expected to be familiar with the idiom and workings of the heroin community").  The First Circuit has therefore recognized that

"[i]t is clearly permissible for properly qualified law enforcement agents to testify about...the meaning of coded or slang words" in drug cases. United States v. Tejada, 886 F.2d 483, 486 (1st Cir. 1989) (emphasis added).

Moreover, training and experience in narcotics cases qualifies an agent to testify as an expert on drug jargon. As the First Circuit has recognized "hard-core drug trafficking scarcely lends itself to ivied halls. In a rough-and-ready field such as this, experience is likely the best teacher." Hoffman, 832 F.2d at 1310 (upholding DEA agent with 12 years experience as expert). See also United States v. Rivera-Rosario, 300 F.3d 1, 17 (1st Cir. 2002) (upholding agent's testimony as a "drug expert in coded conversations" based on agent's "experience and training"); United States v. Villarmein-Oveido, 325 F.3d 1, 13 (1st Cir. 2003) (agent "was clearly qualified by experience and the specialized knowledge that he had acquired over the years to opine on the meaning of code words").

TFA Chavez has "particularized knowledge" of and "special familiarity" with the codes employed by the defendants to disguise the true nature of their dealings by virtue of his position as an experienced narcotics investigator who participated in undercover buys from members of this conspiracy and who personally monitored hundreds, if not thousands, of intercepted calls in which the defendants were participants.

Specifically, TFA Chavez, a veteran narcotics investigator who is fluent in English and Spanish,[2] participated in five undercover purchases of heroin from Reynaldo Rivera involving his "runners," Zuleima Reyes and/or Santiago Arroyo, in December 2003 and January 2004.  Having made undercover buys from several co-conspirators in this case, TFA Chavez was in a unique "insider" position with respect to some of the charged defendants' drug distribution activity.  During his conversations with Rivera and Reyes related to the purchases of heroin, Chavez used coded language over the telephone to discuss the substance heroin (for example, the terms "huevo" or "huevitos" meaning "egg" or "little egg" and "finger" were used to describe 10 grams of heroin).

TFA Chavez was also responsible in large measure for monitoring the conversations, the majority of which were in Spanish, intercepted during these wiretaps.  Among other things, Chavez will testify in this case about the use of codes in specific intercepted telephone conversations and his interpretation of those codes in the context of heroin distribution.  Drug seizures were made during this investigation that directly corroborate TFA Chavez's interpretation.  For example, on June 7, 2004, Rivera was intercepted asking Santiago for "two CDs - a salsa and bacheta."  Agents then seized two

---

[2]The qualifications of TFA Marcos Chavez and Trooper Jamie Cepero and Captain Terry Hanson are set forth in detail in the Government's Summary, attached as Attachment 1.

"fingers" of heroin from Rivera's vehicle after seeing Santiago placing the "CD's" inside the vehicle.

Even assuming *arguendo* that Chavez is not recognized as an "expert" *per se*, his interpretation of coded conversations is nevertheless admissible in light of his training, experience and participation in this investigation. Federal Rule of Evidence 701 provides,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The Rules of Evidence permit law enforcement agents to provide opinion testimony as lay witnesses about the meanings of conspiracy-specific coded terms from listening to a wiretap. See United States v. Garcia, 2005 WL 1444146 *7-12 (2nd Cir. (NY)); United States v. Grinage, 390 F.3d 746, 750 (2nd Cir. 2004), cert. denied sub. nom. Reneau v. United States, 125 S. Ct. 1961 (2005); United States v. Peoples, 250 F.3d 630, 641 (8th Cir. 2001).

Although the First Circuit has not addressed this issue with respect to Fed. R. Evid. 701 in the specific context of wiretap interceptions, several other circuits have allowed a law enforcement agent to testify as lay witnesses about such topics.

United States v. Miranda, 248 F.3d 434, 441 (5th Cir. 2001); United States v. Novaton, 271 F.3d 968 (11th Cir. 2001), holding modified by Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 n.7 (11th Cir. 2003)(extending Novaton's holding to post-amendment Rule 701); United States v. Garcia, 994 F.2d 1499, 1507 (10th Cir. 1993)(FBI language specialist allowed to testify as lay witness under Rule 701 that co-conspirator was referring to defendant in conversation with defendant's wife when he referred to "your old man").  In these cases, for a law enforcement agent to testify about his opinion as a lay witness concerning conspiracy specific phrases heard through a wiretap, the witness must have personally perceived the conversation as it occurred.  United States v. Peoples, 250 F.3d at 641; United States v. Novaton, 867 F.Supp. 1023, 1025 (S.D. Fl. 1994). This does not require that the agent engage in the conversation in question or that the participants must be aware of the agent's presence, but that the agent overhead the conversation at the time it occurred over the wiretap.  United States v. Novaton, 867 F. Supp. at 1025; compare United States v. Peoples, 250 F.3d 630, 640-41 (8th Cir. 2001)(error to admit an FBI agent's lay testimony about the meaning of conspiracy-specific words, because agent had not listened to the conversations as they occurred and instead based her opinion only on "investigation after the fact").  In United States v. Novaton, monitors of wiretap

conversations were allowed to testify as lay witnesses concerning references to planned drug sale events because the monitors testified only about conversations that they themselves listened to as the conversation occurred. 867 F.Supp. at 1025, 1026.

The Fifth, Eighth and Eleventh Circuits, however, have held that an agent might have personal knowledge of the facts of the conversation based upon listening to the overheard conversation at some point in time, and on his overall participation in the wiretap investigation or experiences with the suspects. See United States v. Peoples, 250 F.3d at 641; United States v. Miranda, 248 F.3d at 441; United States v. Novaton, 271 at 1008. For example, the Fifth Circuit in United States v. Miranda allowed a FBI agent to testify about the meanings of coded words used only by the conspiracy because he had "extensive participation in the investigation of this conspiracy, including surveillance, undercover purchases of drugs, debriefings of cooperating the monitoring and translating of intercepted telephone conversations." 248 F.3d at 441. Implicitly, the court accepted that this agent's first hand knowledge came not from only what he directly overheard, but the totality of his experiences within the investigation. See id.

Significantly, the First Circuit has found that the perception requirement of Rule 701 could be met by personal knowledge based on past experience or even experiences that occur

later.  See United States v. Wilkerson, 411 F.3d 1, 7 (1 st Cir. 2005); United States v. Ayala-Pizarro, 407 F.3d at 28-29.

In United States v. Ayala-Pizarro, a police officer was allowed to testify as a lay witness about a certain street where the defendant was arrested for a narcotics offense as being a "drug point," and that heroin seized from that area was "basically packed in . . . aluminum decks" (which matched the appearance of the heroin seized from the defendant in that case). 407 F.3d 25, 28-29 (1st Cir. 2005).  The Ayala-Pizarro Court specifically stated, "[w]e agree with the government that neither type of testimony was expert testimony at all, but was admissible as lay witness testimony under Fed. R. Evid. 701, even after the amendments to the two rules in December 2000."  Id.  The First Circuit held that the police officer had met the first hand perception requirement because he had "particularized knowledge" by virtue of his position as a police officer whose assignment was to patrol that street frequently.  Id.  The Court noted that, "'the line between expert testimony under Fed. R. Evid. 702 . . . and lay opinion testimony under Fed. R. Evid. 701 . . . is not easy to draw.' (Citation omitted). Indeed, the same witness – for example, a law enforcement officer – may be qualified to 'provide both lay and expert testimony in a single case.'" Id. The Court then concluded that the witness' testimony "did not cross the line to become expert testimony." Id.

Similarly, in <u>United States v. Wilkerson</u>, the First Circuit allowed a detective to testify his opinion as to the meaning of the defendant's post-arrest statement concerning his attempt to escape capture, to wit: that he "grabbed the tall fence to get up on the small fence." 411 F.3d at 6-7. The Court found that the detective had met the "perception" requirement because he had "special familiarity" with the defendant's escape route, having investigated it both before and after interrogating the defendant. <u>Id.</u> The Court also rejected the defendant's assertion that the statement was clear and unambiguous, finding the detective's opinion to meet the helpfulness requirement. <u>Id</u>.

In <u>United States v. Villarman-Oviedo</u>, a case nearly on all fours with the present case, the First Circuit affirmed the District Court's decision permitting a government agent to testify regarding the meaning of code terms used in a drug conspiracy regardless of whether the testimony was properly characterized as lay opinion under Fed. R. Evid. 701 or expert testimony under Fed. R. Evid. 702. 325 F.3d 1, 13 (1st Cir. 2003). The District Court in <u>Villarman-Oviedo</u> allowed an experienced narcotics detective, who had listened to thousands of intercepted telephone calls, to testify about general narcotics distribution activities in Puerto Rico as well as interpreting coded language in the intercepted calls. <u>Id</u>. At 7. The First Circuit concluded in the circumstances of this case that it was

unnecessary to decide the correctness in characterizing the witness' testimony as lay testimony rather than expert testimony because the detective-witness was qualified by experience and the "specialized knowledge" he had acquired over the years to render opinions on the coded language used by the defendants in that case.

Here, TFA Chavez listened to the majority of calls as they occurred and relayed the information about these calls – including his conclusion that certain coded conversations were drug-related – to the agents in the field. TFA Chavez will testify that in his experience, drug traffickers use coded and veiled references to hide their locations and rarely (if ever) use the words "heroin" or "drugs." He will then offer his interpretation of specific conversations intercepted pursuant to T-III orders. Whether characterized as lay or expert opinion, TFA Chavez is qualified to render his interpretation of these codes through (1) his experience and training, (2) his participation in undercover buys with members of the criminal organization,(3) his monitoring of the intercepted calls in which coded or cryptic language is used and his participation in this investigation, and (4) seizures made during the investigation that corroborate Chavez's interpretations.

*Trooper Jaime Cepero and Captain Terry Hanson*

Trooper Cepero did not participate in this investigation and

11

therefore is not a fact witness.  Rather, TFA Cepero, a highly experienced narcotics investigator who has previously been recognized as an expert by federal and state courts in these matters, will testify to general narcotics-related practices. Similarly, Captain Hanson, who did participate in this investigation, may testify to his experience with respect to evidence accumulated in this case, including, but not limited to, the use of "hides" [hidden compartments] in vehicles to transport drugs or money undetected by law enforcement, and the use of a paging device as a means to identify the person sending the page and the quantity of drugs that person desires from the possessor of the pager.[3]  The Government's Summary of Testimony to be Offered Under Fed. R. Evid. 702 describes in detail the summary of anticipated testimony as follows,

> Based on their examination, training, and experience, Troopers Cepero and/or Hanson and/or TFA Chavez ("the witness(es)") will testify to the general criminal narcotics-related matters, including undercover work; controlled buys; the use of confidential informants, search warrants, and electronic surveillance; how heroin is ingested an any paraphernalia associated with its use; the drug-distribution pyramid, including where and how heroin is manufactured, how it is imported into the U.S., and the general manner in which it makes its way to the ultimate consumer; the packaging associated with heroin distribution and the weights and purity in which it is commonly distributed from its point of

---

[3]For example, on 09/26/04 the following numeric message was intercepted over Santiago's pager at 3:12 p.m.: "454 9369-100". This message identifies the caller (Agosto) by telephone number "454 9369" and the amount of heroin he desires "100" [meaning 100 grams].

arrival in the U.S. to the ultimate consumer; common diluents used to "cut" or lessen the purity of heroin; the price-ranges of various quantities of heroin in the Greater Boston area in 2004 and the value of the heroin seized in connection with this case; the absence of the means to consume heroin in this case and its significance; the use of hidden compartments (or "hides") inside motor vehicles to store drugs, money or other paraphernalia in furtherance of drug distribution; the use of firearms as "tools of the drug trade" and as a means of protecting their drug business; the use of "stash pads" or apartments belonging to associates in the drug trade to store and distribute heroin from; counter surveillance measures to detect law enforcement; the use of various implements in heroin distribution (many of which were seized in connection with this case), including, but not limited to scales, heat sealers, presses, spoons, surgical masks and gloves, money, money counters, plastic baggies with or without logos, false forms of identifications, pagers and drug records or "cuff" sheets. The witness(es) may also discuss the use of portable cellular telephones and pagers in drug distribution; that drug dealers frequently use telephones subscribed to by other nominees or fictitious individuals; and that drug dealers commonly "drop" or change telephones in an effort to thwart law enforcement. The witness(es) may also discuss the common use of coded language by drug distributors and the use of codes entered into paging devices in furtherance of narcotics distribution, and that various code words were used in the present case to describe heroin, drug distribution, and money, and codes were entered into Santiago's pager. The witness(es) will opine that the heroin seized in connection with this case, along with the other drug-related paraphernalia, in particular the heroin seized from the residences of Santiago, Rivera, Rodriguez, and the heroin seized from the person of Agosto and Rodriguez, is consistent with the distribution of heroin rather than the possession for personal consumption.

This type of testimony related to general narcotics related matters is beyond the ken of ordinary citizens and is admissible whether characterized as Rule 701 or Rule 702 testimony (or

neither). See United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005) (policeman allowed to testify as lay witness about area where the defendant was arrested for a narcotics offense as being a "drug point," and that heroin seized from that area matched the appearance of the heroin seized from the defendant in that case); United States v. Wilkerson, 411 F.3d at 6-7 (proper to allow a detective to offer his opinion as to the meaning of the defendant's post-arrest statement concerning his attempt to escape capture because he had "special familiarity" with the defendant's escape route); United States v. DiMarzo, 80 F.3d 656, 659-660 (1st Cir. 1996)(veteran agent permitted to testify that drug dealers do not customarily bring casual observers to drug deals; testimony neither lay nor expert opinion, but "simply the witness's personal experience relating to a subject bearing directly upon the appropriateness of a jury inference").

Moreover, even assuming TFA Cepero's and/or Captain Hanson's anticipated testimony qualifies as "expert" testimony under Rule 702, it is clearly admissible in this case. The "district court has broad discretion" in both "the decision to admit or exclude expert testimony" and "determinations as to whether or not a proffered 'expert' is sufficiently well qualified to speak to the subject matter." Thus, the district court's decision will be "entitled to considerable deference in the Rule 702 milieu."

United States v. Hoffman, 832 F.2d 1299, 1310 (1st Cir. 1987).

Under F. R. Evidence 702, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified to appear as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise" as long as the information is reliable.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Court defined the standard for admitting expert testimony under Rule 702. 509 U.S. 579 (1993). The two hallmarks of Rule 702 are that the evidence must be *relevant*, meaning that it will assist the finder or fact in understanding the evidence or determining a fact in issue.  The evidence must also be *reliable*, which the Court defined as having "a reliable basis in the knowledge and experience of [the expert's] discipline." Id. at 591-92.

Though Daubert dealt with scientific testimony, the Court in Kumho Tire Co. v. Carmichael held that Daubert applied to non-scientific or technical expertise as well. 526 U.S. 137, 141 (1999).  While a trial court may consider the specified factors listed in Daubert, "the test of reliability is flexible" and the trial court has "broad latitude" in determining that expert testimony is admissible. Id. at 141-42 (quotations omitted).

Here, the proffered testimony of Cepero and Hanson is both

15

relevant and reliable under the Daubert-Kumho analysis. Assuming a proper foundation is laid, the testimony of both investigators should be permitted at trial.

## Conclusion

For the above-enunciated reasons, the government respectfully urges this Court, after proper foundation has been established, to admit the anticipated testimony of TFA Chavez, Trooper Cepero, and Captain Terry Hanson.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:     /s/ *William F. Bloomer*
William F. Bloomer
Assistant U.S. Attorney
One Courthouse Way
Boston, MA

Date: 13 November 2007

## Certificate of Service

I hereby certify that this document filed through the ECF system on November 13, 2007, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

/s/ *William F. Bloomer*
William F. Bloomer